**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

JUDITH HART,

    Plaintiff,

v.                                                    CIV. NO. 05-519 WPL/DJS

FOREMOST SIGNATURE INSURANCE
COMPANY,

    Defendant.

**MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Judith Hart owns a mobile home that was insured under a homeowner's insurance policy issued by Foremost Signature Insurance Company. She filed a claim under the policy, asserting that the home had been damaged by vandalism. Foremost denied the claim, and Hart brought this action for breach of contract and bad faith. Foremost has moved for summary judgment, arguing that Hart's losses are not covered pursuant to a policy exclusion for vandalism occurring when the home has been vacant for more than thirty days. For the reasons explained below, I will grant the motion for summary judgment.

**SUMMARY JUDGMENT STANDARDS**

Foremost bears the burden of establishing the applicability of the policy exclusion. *See Battishill v. Farmers Alliance Ins. Co.*, 127 P.3d 1111, 1113 (N.M. 2006); LEE R. RUSS, COUCH ON INSURANCE § 254:12 (3d ed. 1995); *see also Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152, 1172 n.11 (10th Cir. 1981) (plurality opinion) ("[I]n a diversity case the question of the burden of proof is one of local law . . . ."). Therefore, to be entitled to summary judgment on

the basis of the exclusion, Foremost must present evidence that would entitle it to a directed verdict at trial on that basis. *See Anderson v. Dep't of Health & Human Servs.*, 907 F.2d 936, 947 (10th Cir. 1990); *see also Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997). In considering whether Foremost has met this burden, I must view the record and all reasonable inferences therefrom in the light most favorable to Hart. *See Muñoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000).

## RELEVANT FACTS

In 2004, after living in the mobile home in Albuquerque for several years, Hart decided to attend school full time in Texas. (Pl.'s Dep. at 33-34, 36, 38-39.) She listed the home for sale in early July 2004 and took her last load of personal belongings from the home on July 12. *Id.* at 41, 91-93. Although Hart testified that she intended to stay in the home if she visited New Mexico before it sold, she did not return to the home until she learned of the vandalism on September 20, 2004. *Id.* at 123-24, 188, 265-66. To her knowledge, no one spent the night at the home between July 12 and September 20. *Id.* at 137.

After July 12, 2004, the only things remaining in the living room were a plastic chair and "one or two decorations," such as a "rope doll." *Id.* at 104-05. Previously, the living room had a large sofa, a love seat, two recliners, two entertainment centers, a television, and "lots" of books. *Id.* at 119.

The only items remaining in Hart's bedroom were some empty boxes, crate-type moveable shelving, a mattress pad, sheets, a couple of blankets, an old coat, coat hangers, and extra light bulbs. All of these items were in the closet. *Id.* at 114-15. There was no furniture in the bedroom. *Id.* at 115. Previously, the bedroom had a bed, some old dressers, and baskets of clothes. *Id.* at 117.

Hart's son's bedroom contained only some shelving with a couple of items on it. Previously, the bedroom had bunk beds, a dresser, a desk, and her son's personal belongings. *Id.* at 102. The guest bedroom had some empty boxes, empty sacks, and clothes hangars. Previously, that bedroom had a bed, desk, computer center, and big shelves with boxes and other items stored on them. *Id.* at 102-03.

The refrigerator remained in the kitchen, along with some built-in appliances. Hart left the refrigerator so she could use it if she returned to the home. She also thought she might include it in the sale of the home. *Id.* at 109-10. Inside the refrigerator were drinks and condiments for Hart to use to make sandwiches if she returned. *Id.* at 107-08. The kitchen table was gone, but three or four "plastic lawn resin" chairs remained. *Id.* at 118. The kitchen cabinets contained plates and other dishes, some knives and silverware, a couple of pots, a skillet, a pizza pan, cleaning supplies, dish soap, matches, trash bags, paper towels, disposable plates and cups, and salt and pepper. *Id.* at 93, 108, 110. Fewer of these types of items were in the cabinets than when Hart was living there. *Id.* at 108. Most of her plates, silverware, and items of that nature had been removed. *Id.* at 109.

The master bathroom had cleaning supplies under the sink, towels in a cabinet, a bath mat, miscellaneous toiletries, and a couple of artificial flower arrangements. *Id.* at 115-17. The second bathroom had some cleaning supplies under the sink, toilet paper, soap, and a shower curtain that Hart intended to include with the sale of the home. *Id.* at 103-04. The utility room contained tools, cleaning supplies, mops, brooms, a shovel, paint, paint brushes, and moveable shelving. *Id.* at 111-12. The washer and dryer had been moved to Texas. *Id.* at 112.

Nothing remained in the hallway. Previously, the hallway contained shelves with camping and fishing equipment, toys, and boxes of clothing. *Id.* at 103. Hart left all the window treatments in the

3

home because they were going to be included with the sale. *Id.* at 93.

A couple of lawn chairs were still in the backyard. An old wagon, skirting, window supplies, extra window frames, extra doors, and a trash can were under the deck. *Id.* at 114, 119. The storage shed had yard tools, a ladder, swamp cooler supplies, old camping equipment, and large boxes containing miscellaneous items. *Id.* at 119-20.

Although she contended that the house was not empty, Hart agreed that the living room and bedrooms looked empty, except for the items in the closets and cabinets. *Id.* at 99, 121-23. Hart allowed her neighbors to park their vehicles in the driveway intermittently so the home would appear to be occupied. *Id.* at 134. Her realtor also stopped by several times a week to show the home or to switch the lights on and off. *Id.* at 140. Hart paid someone to care for the yard. *Id.* at 136. The home continued to have gas, electricity, water, and garbage service. *Id.* at 133, 170, 178-79.

Hart testified that her time in Texas was intended to be "very temporary," that she had no desire to live there permanently, and that she thought she would "possibly" return to Albuquerque when she finished her course of study. *Id.* at 30. It would take eighteen months to two years to complete the course of study. *Id.* Hart obtained a Texas driver's license in July 2004. *Id.* at 127-28.

## DISCUSSION

The insurance policy contained an exclusion for loss "caused by vandalism and malicious mischief if the dwelling has been vacant for more than 30 consecutive days immediately before the loss." (Def.'s Mem. Supp. Summ. J. Ex. A.) The dispute centers on the meaning of the word "vacant," which is undefined in the policy. It is undisputed that the substantive law of New Mexico applies and that there is no New Mexico case construing the word "vacant" as used in the exclusion.

Foremost points out that the New Mexico Administrative Code defines "vacant structure" to

mean "a structure in which no person has lived for at least thirty consecutive days." N.M. CODE R. § 13.13.2.7(I). Beyond merely noting that Hart's home fits within this definition, Foremost offers no comment as to how the definition should guide the interpretation of Hart's policy. Foremost does not assert that the definition controls the interpretation of the word "vacant" in the policy.

The "vacant structure" definition is part of a rule that applies to "residential property insurance." *Id.* § 13.13.2.2. "Residential property insurance" refers to insurance of a "residence" against direct loss or damage from fire or "extended coverage peril," *i.e.*, "windstorm, hail, smoke, explosion, riot or civil commotion, aircraft damage, vehicle damage, or volcanic eruption." *Id.* § 13.13.2.7(H), (D). The definition of "residence" excludes a "vacant structure." *Id.* § 13.13.2.7(G).

There is no indication from the record or from Foremost's motion that Hart's losses were caused by fire or extended coverage peril. Moreover, Hart's policy uses the language "vacant for more than 30 consecutive days immediately before the loss" rather than simply "vacant structure." The words "for more than 30 consecutive days immediately before the loss" would be superfluous if the parties intended "vacant" to incorporate the administrative definition of "vacant structure." It thus appears that the administrative definition of "vacant structure" is not controlling in this case. Accordingly, I must turn to New Mexico cases concerning the interpretation of insurance policies and to cases from other jurisdictions concerning the interpretation of the vacancy exclusion at issue here.

The New Mexico Supreme Court recently considered the meaning of "vandalism and malicious mischief" in this vacancy exclusion. *See Battishill*, 127 P.3d at 1112. The court held that an undefined term does not render an insurance policy ambiguous. *Id.* at 1113. Such a term is to be interpreted in its common, ordinary, and popular sense. *Id.* at 1113-14. The definition should usually be based on contemporary usage "because the issue is how a reasonable insured would understand

5

the term at the time of purchase." *Id.* at 1114. A dictionary may provide the common, ordinary, and popular meaning of a term. *Id.* at 1113-14.

Neither party has cited a dictionary definition of "vacant." The Merriam-Webster Online Dictionary defines "vacant" as "being without content or occupant," as in "a vacant seat in a bus" or "a vacant room." It also defines the word as "not lived in," as in "vacant houses." MERRIAM-WEBSTER ONLINE DICTIONARY, at http://www.m-w.com/dictionary/vacant. Similarly, the American Heritage Dictionary defines "vacant" as "[c]ontaining nothing, empty . . . [n]ot occupied or put to use." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000), at http://www.bartleby.com/61/16/V0001600.html. Although these definitions encompass the concepts of lack of inanimate things and lack of human occupancy, the parties disagree as to whether human occupancy is relevant in determining whether the vacancy exclusion applies. Foremost argues that it is relevant, and Hart argues that it is not.

Hart relies on numerous cases that discuss the distinction between the words "vacant" and "unoccupied." The exclusions at issue in some of these cases, unlike the one at issue here, used both words, thus requiring the courts to ascribe a different meaning to "vacant" and "unoccupied." *See, e.g., Rainwater v. Maryland Cas. Co.*, 166 S.E.2d 546, 548-49 (S.C. 1969); *Foley v. Sonoma County Farmers' Mut. Fire Ins. Co.*, 115 P.2d 1, 2 (Cal. 1941) (Traynor, J.); *see also* COUCH ON INSURANCE, *supra*, § 94:131 (indicating that "vacant" may be treated as synonymous with "unoccupied" unless the exclusion uses both words).[1]

---

[1] Hart notes that a different section of her policy uses the words "vacant or unoccupied." She does not, however, advance any argument based on this section. I find the section immaterial because the exclusion at issue here is unambiguous. *See Battishill*, 127 P.3d at 1115 ("We only look to other sections in a policy for clarification, not in an attempt to create an ambiguity where none exists.").

Nevertheless, Hart is correct in observing that courts have struggled with the distinction between vacant and unoccupied. Some courts have stated that "vacant" means the absence of inanimate things and "unoccupied" means the absence of animate beings. *See, e.g., Foley*, 115 P.2d at 2; *see also Thompson v. Green Garden Mut. Ins. Co.*, 633 N.E.2d 1327, 1330 (Ill. App. Ct. 1994) ("[T]hough plaintiff was not living in the house, it is beside the point since the policy excludes only vacant premises, not unoccupied premises."). Other courts have treated "vacant" as a more inclusive word than "unoccupied," so that "vacant" means the absence of both things and people, while "unoccupied" refers only to the absence of people on a regular basis. *See, e.g., Myers v. Merrimack Mut. Fire Ins. Co.*, 788 F.2d 468, 471 (7th Cir. 1986); *Jelin v. Home Ins. Co.*, 5 F. Supp. 908, 908-09 (D.N.J.), *aff'd*, 72 F.2d 326 (3d Cir. 1934).

More recently, courts have begun to focus on the intended use of the insured property and the reason for the vacancy exclusion. The risk of vandalism increases when a home is not regularly occupied. *See Langill v. Vermont Mut. Ins. Co.*, 268 F.3d 46, 48-49 (1st Cir. 2001).

In *Langill*, a rental dwelling was damaged by fire while undergoing renovations.[2] The apartments had no tenants, but the doors were kept locked, utilities were maintained, and heating oil was supplied. Inside the dwelling were tools, a step ladder, two chairs, a radio, an ash tray, and a mattress, frame, and box spring. The owner's husband spent one or two hours in the middle of each day renovating the dwelling. He visited with friends there on some nights, and he slept there one night. *Id.* at 47. The court held that "the sustained presence of a resident, particularly in the hours of darkness, appears logically as the critical factor where the premises are a dwelling. . . . assum[ing]

---

[2] Hart attempts to distinguish *Langill* on the ground that it involved a rental dwelling, but she does not explain how this distinction makes a difference. Moreover, some of the cases that she relies on involved rental properties. *See, e.g., Thompson*, 633 N.E.2d at 1328.

7

the presence of furnishings and amenities minimally necessary for human habitation." *Id.* at 49 (citation and internal quotation marks omitted). The court determined that the dwelling was vacant, stating:

> [T]he approximation to an inhabited abode is not measurably advanced by the motley and sparse inventory of chairs, mattress, and step ladder. Nor does the midday hour or so of work activity convey the appearance of residential living. And random evening visits hardly provide the appearance of somebody being at home or effective anti-vandal protection. [N]one of the activities . . . changed the fact that at the critical and likely times for vandalism and arson, there was no one in the house to discourage, see, or hear marauders . . . .

*Id.* at 48-49; *accord Vennemann v. Badger Mut. Ins. Co.*, 334 F.3d 772, 773-74 (8th Cir. 2003); *Estes v. St. Paul Fire & Marine Ins. Co.*, 45 F. Supp. 2d 1227, 1230 (D. Kan. 1999); *Speth v. State Farm Fire & Cas. Co.*, 35 P.3d 860, 863-64 (Kan. 2001). *But see Lundquist v. Allstate Ins. Co.*, 732 N.E.2d 627, 629, 631 (Ill. App. Ct. 2000) (fact question existed as to whether dwelling that contained paintings, decorations, house plants, tools, rakes, shovels, clothes, toothbrushes and other toiletries, chairs, blankets and other bedding, tables, kitchen appliances, dishes, cooking pots, mirrors, a lawn tractor, and a fully equipped weight room was vacant); *Thompson*, 633 N.E.2d at 1328-31 (fact question existed as to whether dwelling that contained stoves, refrigerators, kitchen chairs, an air conditioner, and an air mattress was vacant).

In *Battishill*, the New Mexico Supreme Court rejected the historical connotation of the word "vandalism" in favor of dictionary definitions and contemporary usage. 127 P.3d at 1114. As noted above, dictionary definitions of "vacant" encompass the concept of lack of human occupancy. *See, e.g.,* MERRIAM-WEBSTER ONLINE DICTIONARY, at http://www.m-w.com/dictionary/vacant (defining "vacant" as "not lived in"). The dictionary definitions also correspond with the direction that contemporary cases have begun to take in construing the word. Accordingly, I conclude that a home

is "vacant" within the meaning of the exclusion at issue here when it is "not lived in," *i.e.*, when it lacks regular human occupancy and furnishings minimally necessary for habitation.

It is undisputed that Hart did not enter the home for more than thirty days before the vandalism occurred and that no one spent the night there during that period. The only people who entered the home were the realtor and prospective buyers. These visits appear to have been less regular and frequent than the activity in *Langill*.

However, even accepting for argument's sake that the lack of human occupancy is irrelevant, Hart's home was still vacant. As in *Langill*, the home contained only a "motley and sparse inventory" of belongings. Although some of the cases cited by Hart purport to define "vacant" as completely lacking in contents, in practice, courts apply a de minimis limitation. *See, e.g., Jerry v. Kentucky Cent. Ins. Co.*, 836 S.W.2d 812, 815 (Tex. App.--Houston [1st Dist.] 1992) ("The term 'vacant' means entire abandonment, deprived of contents, empty, that is, without contents of substantial utility."); *see also Jelin*, 5 F. Supp. at 909 (recognizing a de minimis limitation as a matter of common sense). As stated by one prominent commentator, "For property to be considered vacant, it need not be totally free of any fixtures and furnishings; it is enough if the state of the structure's interior, combined with surrounding circumstances, indicate that the premises are not being used in any regular manner." COUCH ON INSURANCE, *supra*, § 94:132. Hart's home contained only kitchen appliances, a few chairs, cleaning and remodeling supplies, toiletries, and other miscellaneous items. Some of the items were stored in closets. "A reasonable person walking up to the house and looking through a window would conclude that it was 'vacant' as that term is understood in its plain and ordinary usage." *Speth*, 35 F.3d at 864.

9

## CONCLUSION

I conclude that Foremost has established the applicability of the vacancy exclusion as a matter of law. Because there is no genuine issue of material fact regarding whether Hart's mobile home was vacant at the time of the vandalism, Foremost's motion for summary judgment [Doc. 30, 32] is granted. *See* FED. R. CIV. P. 56(c). Foremost has also filed a motion for partial summary judgment on Hart's bad faith claim. [Doc. 40]. That motion is denied as moot. This cause is dismissed with prejudice.

IT IS SO ORDERED.

*William P. Lynch*
WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.